**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **VEEVA SYSTEMS INC.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  23-1032** |
| | : | |
| **TACT.AI TECHNOLOGIES, INC.,** | : | |
| **AKTANA, INC.** | : | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                                                                      **June 5, 2024**

This is a patent infringement case between companies that sell software services to the life-sciences industry.  We denied a motion to stay discovery, and now we are catching up and addressing a pending motion to dismiss.  Aktana asks us to hold all three of Veeva's asserted patents invalid for lack of patentable subject matter under the Supreme Court's two-step test in *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014).  *Alice* says that you cannot patent a claim that is directed to an abstract idea and implemented with conventional computer technology.  The patents in this case generally relate to computer software responsible for storing, summoning, displaying, and transmitting business information, so it is unsurprising to face an *Alice* motion early in the case.  But this is a court, not a patent office.  It is ever the **movant's** burden to demonstrate entitlement to relief.  In an *Alice* motion, that means proposing an abstract idea that fits the claim and making a persuasive case that the claim is directed to that abstract idea and not some specific technological improvement.  Aktana failed at this task.  Aktana also argues that Veeva failed to adequately allege infringement.  We deny the motion to dismiss in its entirety.

I.        **Background**

The parties in this case sell various software products and services designed to facilitate and enhance sales and marketing communications.  *See* DI 14 ¶¶ 9-12.  Veeva alleges infringement of three United States Patents:

- 9,391,937 ("**the 937 patent**," entitled "System and Method for Controlling Electronic Communications"), *id.* ¶ 16,

- 9,055,023 ("**the 023 patent**," entitled "System and Method for Controlling Electronic Communications"), *id.* ¶ 30, and

- 11,501,313 ("**the 313 patent**," entitled "System and Method for Displaying Data from a Storage"), *id.* ¶ 44.

*See also id.* ¶ 1.[1]  Veeva alleges that Aktana is infringing the asserted patents.[2]  *See generally id.*

The three patents fall into two groups: the 937 and 023 patents (which have specifications that are materially similar for purposes of this motion) and the 313 patent.  The parties seem content to use claim 1 of the 023 patent as representative of the pair, and claim 1 of the 313 patent for the other.  Starting with the 937 and 023 patents, claim 1 of the 023 patent recites:

> 1. A machine-implemented method for generating approved electronic messages, the method comprising:
>
>> establishing a controlled content repository, the controlled content repository being securely and controllably accessed;
>>
>> establishing an access protocol for the controlled content repository, whereby approved content is stored in the controlled content repository according to the access protocol and whereby the access protocol comprises at least one set of alignment rules for determining if a first item of approved content within the controlled content repository can be

---

[1] The U.S. Patent and Trademark Office issued the 937 patent on July 12, 2016, the 023 patent on June 9, 2015, and the 313 patent on November 15, 2022.  DI 14 ¶¶ 16, 30, 44.

[2] It is a little more complicated than that because of the other defendant — Tact.ai.  But because the details are largely immaterial here, we will simply refer to Aktana.

made available to a first customer via an electronic message;

storing the approved content within the controlled content repository, the approved content further being accessible according to the established access protocol;

aligning the approved content within the controlled content repository with information from an information management system;

providing the first item of approved content within the controlled content repository for selection by a sender after a determination that the first item of approved content within the controlled content repository is authorized to be made available to the first customer in accordance with the at least one set of alignment rules; and

providing an approved electronic message generating system which generates an electronic message according to the established access protocol for sending the provided first item of approved content within the controlled content repository to the first customer.

023 patent at 14:39-15:2.[3]

Generally speaking, the 937 and 023 patents involve problems arising from "modern electronic communications such as email" in fields subject to regulation such as pharmaceutical sales.  023 patent at 1:25-29.  According to the patents:

sales reps typically are restricted from sending email communications to prescribing doctors because of the enormous risks that can flow from unapproved, uncontrolled messages.  For example, a careless rep or other personnel might send an email to a subscribing doctor suggesting off-label uses for a drug.  This could end up exposing the company employer (e.g., a pharmaceutical company) to regulatory penalties or other legal liabilities.

*Id.* at 1:31-39.  To address this problem, the patents present systems and methods that "allow for control of email content for communications between system users and email recipients (customers)."  *Id.* at 3:17-19.  This involves a "controlled content repository" that stores various

---

[3] The patents may be found as attachments to the first amended complaint.  *See* DI 14-1. In the citation format xx:yy, xx refers to column number and yy refers to line number.

data like approved content, customer preferences, regulatory requirements, audit trails, metadata, and the like. *Id.* at 4:14-33. Figures 1 and 2 illustrate exemplary architectures of the invention:



The claims lay out the steps (or system components) — among other aspects, establishing the controlled content repository, establishing an access protocol for the repository that governs how the content may be accessed, and passing that content in and out of the repository according to the established rules. According to the patents, a variety of benefits flow from the claimed inventions, such as "faster and more organized access to" documents, facilitation of "seamless collaboration" between participants, *id.* at 6:17-21, and "the synergy of combining these particular systems is that the generation of the controlled content can be done in a controlled fashion such that the approved content can be sent to customers with greater confidence in the integrity of the data being sent," *id.* at 7:51-55.

The 313 patent focuses on the visualization of the data and the user interface. *See* 313 patent at 1:23-51. The 313 patent explains that multi-field user interfaces common in customer relationship management (CRM) systems "are convenient for data entry, but not convenient for users to understand and use the data." *Id.* at 1:14-16. To address this problem, the patent claims

methods for displaying data that involve combining a data visualization interface (which renders the report for the user) and a separate application programming interface (which helps query the CRM data) in such a way that the user may configure and view customized reports.  Figure 5 of the 313 patent illustrates one embodiment:



**FIG. 5**

In connection with Figure 5, the 313 patent explains how a user can create a custom report layout consisting of text and graphical data of various types, and how code embedded in

the data visualization interface can work with the application programming interface to pull in data from the CRM and populate the report.  *Id.* at 5:55-7:7.  To that end, at least with respect to certain prior art at issue during prosecution, the Patent Trial and Appeal Board (PTAB) characterized claim 1's advance over that prior art as the requirement for a data visualization interface that is separate and distinct from the application programing interface.  DI 33-1 at 19-20 (ECF) (PTAB Decision on Appeal in the application that led to the 313 patent).

## II.    Aktana's Motion to Dismiss

Aktana's motion primarily argues that the asserted patents claim ineligible subject matter. *See generally* DI 21.  Its arguments follow a similar pattern for all three patents.  Applying step one of *Alice*, Aktana asserts that 937 and 023 patent claims are directed to "the abstract idea of preparing approved messages."  *Id.* at 7.  For the 313 patent, it is "the abstract idea of generating, displaying, and updating data in a report."  *Id.* at 13.  Turning to step two of *Alice*, Aktana argues that the technological aspects of Veeva's patent claims are either generic or conventional, and do not add an inventive concept.  *Id.* at 11-12; 17-18.

Across the board, Veeva argues that Aktana failed to meet its burden of proof, failed to establish appropriate or viable abstract ideas, relied on oversimplifications and made-up hypotheticals, and failed to account for claimed technological advances.  DI 33 at 3-18.  For the 937 and 023 patents specifically, Veeva argues that the claims offer technical improvements in the field of electronic communications.  *Id.* at 13-16 (analogizing to *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018)).  For the 313 patent, Veeva adds that the claimed method solves a technical problem arising from CRM interfaces with a specific programming approach.  *Id.* at 8-9 (analogizing to *Enfish LLC v. Microsoft Corp.*, 822 F.3d 1327

(Fed. Cir. 2016)).  For all three patents, Veeva also responds that even if Aktana had met *Alice*

step 1, the claims include transformative inventive concepts.  On reply, Aktana endeavors to

rebut Veeva's legal authority but stands by its characterization of the abstract ideas at issue.  *See*

*generally* DI 34.

Aktana also moves to dismiss under Rule 12(b)(6) on the basis that Veeva failed to plead

any plausible claim of infringement.  This issue warrants little discussion and will be addressed

at the end of the opinion.  We have subject-matter jurisdiction.  *See* 28 U.S.C. § 1331.  We heard

oral argument on Aktana's motion.  For the reasons explained below, we deny.

### III.   <u>Analysis</u>

We will address patent eligibility followed by the infringement issues.

#### A. *Tact.AI failed to show that the claims are patent ineligible under Alice.*

*Alice* calls for a two-step analysis to assess whether patent claims fall within the Supreme

Court's exceptions to 35 U.S.C. § 101.  First, "determine whether the claims at issue are directed

to a patent-ineligible concept."  *Alice*, 573 U.S. at 218.  If so, then "examine the elements of the

claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the

claimed abstract idea into a patent-eligible application."  *Id.* at 221.  But patent eligibility is not

pseudo-jurisdictional — it is an affirmative invalidity defense, and like any other, it is the

accused infringer's responsibility to make out the defense.  The requirement for patent eligibility

under § 101 becomes a defense to infringement under § 282, which places "[t]he burden of

establishing invalidity . . . on the party asserting such invalidity."  35 U.S.C. § 282(a).

Like any dispositive legal question, if ripe, patent eligibility ought to be resolved at the

pleadings stage.  In practice, the patent owner decides whether to accede to resolution as a matter

7

of law or to urge postponement.  Perhaps claim construction is needed, or there are material facts that must be resolved.  *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).  But even if the patent owner cannot come up with any good reason to put off deciding patent eligibility, there is still the question of whether the accused infringer — *the movant* — has put the court in a position to make a sound decision.  Carved in stone somewhere on the wall of every courthouse, it says that the party seeking dismissal under Rule 12(b)(6) has the burden to demonstrate that there is no legally cognizable claim for relief.  *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021) (noting that "every circuit court to address this issue . . . has interpreted Rule 12(b)(6) as requiring the movant to show entitlement to dismissal"); *see* Charles Alan Wright & Arthur R. Miller, 5A Federal Practice and Procedure § 1357 (3d ed. 2019) ("All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists.").

Both steps of *Alice* challenge the movant to explain how the patent claims fail — or is it pass? — the Supreme Court's test.  Here we will focus on the first step because it is dispositive. In a case like this, the movant must formulate a proposed "abstract idea" and then persuade the court that the patent claim is "directed" to that abstract idea.  The movant "must articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful." *Core Wireless*, 880 F.3d at 1361 (quoting *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1347 (Fed. Cir. 2017)).  "[T]he inquiry calls upon [courts] to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter."  *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257

(Fed. Cir. 2016).

There is no one right way assess *Alice* step one — the Federal Circuit has avoided inserting a sub-test — but a good start is to check the precedent just in case there are analogous patent claims. The Federal Circuit and Supreme Court "have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish*, 822 F.3d at 1334; *see also Alice*, 573 U.S. at 221 ("[W]e need not labor to delimit the precise contours of the 'abstract ideas' category."). From a more first-principles point of view, the most insightful approach depends on the type of claim and how parties frame the claimed advance over the prior art. But the step-one equation has at least two variables: the abstract idea — which the movant proposes — and the claim scope — which the parties usually characterize differently. Those two pieces allow the court to assess whether the claim as a whole (as it is understood) is "directed" to the abstract idea (as it is proposed).

In the context of a wordy computer-software claim, often the movant will provide a short phrase meant to capture the abstract idea, and then a chart that translates the claim into plainer English to help illustrate how the claim language relates to the phrase. The phrase typically states the objective or purpose of the software claim — a good start for the movant, since claiming only a goal is forbidden. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016)) (claims "directed to a result or effect that itself is the abstract idea" fail step one). Yet the movant must "be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." *Id.* at 1313 (cleaned up). The chart approach helps figure out which side of that line the analysis falls on. It traces back at least to Judge Prost's original dissent in the *Alice* saga, where the abstract idea was

eventually identified to be intermediated settlement:

**1.** Table 1:

| The Recited Steps | Plain English Translation |
|---|---|
| (a) creating a shadow credit record and a shadow debit record for each stakeholder party to be held independently by a supervisory institution from the exchange institutions; | (a) creating a debit and credit account for each party, |
| (b) obtaining from each exchange institution a start-of-day balance for each shadow credit record and shadow debit record; | (b) checking the account balances in the morning, |
| (c) for every transaction resulting in an exchange obligation, the supervisory institution adjusting each respective party's shadow credit record or shadow debit record. allowing only these [sic] transactions that do not result in the value of the shadow debit record being less than the value of the shadow credit record at any time, each said adjustment taking place in chronological order; and. | (c) adjusting the account balances through the day, and |
| (d) at the end-of-day, the supervisory institution instructing one of the exchange institutions to exchange credits or debits to the credit record and debit record of the respective parties in accordance with the adjustments of the said permitted transactions, the credits and debits being irrevocable, time invariant obligations placed on the exchange institutions | (d) paying the parties at the end of the day if both parties have sufficiently performed. |

*CLS Bank Intern. v. Alice Corp. Pty. Ltd.*, 685 F.3d 1341, 1358 (Fed. Cir. 2012) (vacated) (Prost, J., dissenting).[4]   As Judge Prost's chart effectively illustrated, the claim in *Alice* offered little other than the concept of intermediated settlement — notice how the right-hand column tracks and connects the abstract idea and the claim language itself.  Sometimes these charts do double duty by also showing how the abstract idea is a long-standing economic practice or way of organizing human activity — recognized indicators of ineligibility.  *See Alice*, 573 U.S. at 220-21; *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016) (holding that "filtering [internet] content is an abstract idea because it is a longstanding,

---

[4] *Alice* has a long procedural history, but suffice to say that the Supreme Court's take was consistent with Judge Prost's original panel dissent.

well-known method of organizing human behavior").

Importantly, merely writing down an abstract idea relating to the claim and paraphrasing the claim is easy and proves nothing. The point of the exercise is to help wrap our heads around the *Alice* test — and thus its usefulness derives entirely from its persuasiveness. A persuasive translation illustrates the proposed abstract idea in close reference to the claim language and shows that there is nothing of apparent significance left behind. An unpersuasive translation is confusing, loses too much in translation, or is so complex that it actually hurts the movant by supporting the patent owner's view that claim is not directed to an abstract idea.

**The 937 and 023 patents.** So how did Aktana do? Not well. For the 937 and 023 patents, Aktana proposes "the abstract idea of preparing approved messages." DI 21 at 7. That's exactly what the preamble of claim 1 of the 023 patent says, so surely that is the (doubtless unpatentable) objective of the claim. But the remainder of the claim recites several steps relying on particular software components that look like more than filler — so Aktana's proposed abstract idea comes across as reflexive and unduly general relative to the claim. Aktana also argues that the 937 and 023 patents claim computerized versions of longstanding economic practices that could be (and had been) performed by humans.

To help make its point, Aktana included a *CLS Bank*-like chart, copied below. When reviewing it, keep at the front of your mind the phrase "preparing approved messages," and see

11

if — like in *CLS Bank* — the claim offers nothing other than that abstract idea:

| Representative Claims of the '023 Patent | Example of human-practiced activity |
|---|---|
| **Claim 1** | |
| 1. A machine-implemented method for generating approved electronic messages, the method comprising: | A method for generating approved messages, the method comprising: |
| establishing a controlled content repository, the controlled content repository being securely and controllably accessed; | procuring a file cabinet with drawers, each drawer having a lock on it and only being accessible using a particular key; |
| establishing an access protocol for the controlled content repository, whereby approved content is stored in the controlled content repository according to the access protocol and whereby the access protocol comprises at least one set of alignment rules for determining if a first item of approved content within the controlled content repository can be made available to a first customer via an electronic message; | establishing an access protocol for the file cabinet, whereby message templates are stored in the file cabinet according to the access protocol and whereby the access protocol comprises at least one set of alignment rules for determining if a first message template should be placed in a first customer's associated drawer and thereby made available to the first customer, the associated drawer being labeled with the customer's name; |
| storing the approved content within the controlled content repository, the approved content further being accessible according to the established access protocol; | storing the message template within the file cabinet, the message template further being accessible using the key to open the drawer containing the message template; |
| aligning the approved content within the controlled content repository with information from an information management system; | aligning message templates within the file cabinet with information from a Rolodex or other file cabinet containing information about customers; |
| providing the first item of approved content within the controlled content repository for selection by a sender after a determination that the first item of approved content within the controlled content repository is authorized to be made available to the first customer in accordance with the at least one set of alignment rules; and | providing the first message template within the file cabinet for selection by a sender after a determination that the first message template within the file cabinet is in the drawer labeled with the customer's name, such that it is authorized to be made available to the first customer in accordance with the at least one set of alignment rules; and |
| providing an approved electronic message generating system which generates an electronic message according to the established access protocol for sending the provided first item of approved content within the controlled content repository to the first customer. | providing message templates in the file cabinet such that message templates accessible to a particular customer may be filled out to generate approved messages. |

Plainly, something is wrong.  First, the claim covers a lot of ground that is entirely unnecessary

to accomplish the preparing of an approved message[5] — a clue that the claim is directed to more than merely that abstract idea.  It is difficult even to pinpoint on the right-hand column when exactly Aktana says the human prepares the approved message.  To be sure, narrow claiming is not a free pass through *Alice*.  *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1287 (Fed. Cir. 2018) (explaining that "a claim is not patent eligible merely because it applies an abstract idea in a narrow way").  But Aktana proposed a sweeping abstract idea — its choice as movant — so that's what we have to evaluate.

Second, the "human-practiced activity" on the right side of the chart is confusing and well beyond our ken.  The translation simultaneously introduces mysterious new phrases (like "message template") while leaving other claim terms suspiciously untranslated (like "alignment rules").  Granted, there is only so much that my clerks and I know about file cabinets, Rolodexes, keys, drawers, message templates, and alignment rules.  But despite extended questioning at oral argument, Aktana's counsel really could not explain what in the world was supposed to be happening in that right-hand column.  We were left only more confused.  DI 49 at 8-28.  Counsel was polite enough to blame that on the claim rather than me, but regardless, confusion is no basis to rule.

We could stop there and deny the motion on the 937 and 023 patents, but another aspect of *Alice* step one is worth considering.  In computer software cases, the Federal Circuit often looks to the patent owner's explanation of what — if not an abstract idea — the claim might be "directed to."  Put simply, it is "relevant to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea, even at the first

---

[5] Step 1, prepare message; step 2, approve message according to some rule.

step of the *Alice* analysis." *Enfish*, 822 F.3d at 1335.  Claims tend to survive step one when their focus is improving how the computer works, rather than using the computer merely as a tool to execute an idea (even a very good idea).  *Id.* at 1335-36 (improvement to functionality of computer database); *Core Wireless*, 880 F.3d at 1362 (summarizing cases).  It also helps when the claim's focus is solving a problem *caused by* computers.  *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014) (holding claims eligible where "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks").  The cases say that efficiency is one way to improve how a computer works and establish patent eligibility, but mere automation of a human task does not count.  *Compare Enfish*, 822 F.3d at 1337 (relying on benefits "such as increased flexibility, faster search times, and smaller memory requirements" to hold claims eligible) *with Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) ("[M]ere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology.").

Veeva contends that that 937 and 023 patent claims "improve user interface functionality by enabling secure, authorized, and efficient electronic communications."  DI 33 at 14 (relying on *Core Wireless*).  While not crystal clear, at this stage we are satisfied that the 937 and 023 claims check several eligibility boxes.[6]

First, the claims are aimed at solving a problem caused by e-mail, which allows for "unapproved, uncontrolled messages" that are problematic in regulated fields.  023 patent at 1:33-34.  There is certainly some analogy to pre-computer business challenges, but similarly to

---

[6] Veeva may well develop a fuller record on some of these issues later in the case.

*DDR Holdings*, e-mail made the problem considerable worse — as most of us have learned the hard way, it is much easier to send a careless e-mail than a careless office memorandum because of the very nature of how computers simplify such tasks.  773 F.3d at 1258 (discussing the "warehouse store that contains a kiosk" analogy but noting that the internet presented additional challenges that weighed in favor of eligibility).

Second, the patent claims do considerably more than say "get approval before sending messages."  The claims require using particular software structures in a particular way.  Aktana argues that the claims are a smokescreen, but if that were so, it should have been easy for Aktana to show how the claimed processes are generic or nothing but fluff.  It is true that the present record does not reveal exactly how the 937 and 023 patents overcame the prior art — and although that framing could have helped Veeva by putting a finer point on the technical improvement,[7] it is Aktana's burden, not Veeva's.

Third, while the patent claims certainly advance a business purpose, they also improve computer functionality in a manner analogous to *Core Wireless*.  There, the accused infringer argued that the claims amounted to little more than a generic computer implementation of the concept of an index.  880 F.3d at 1362.  The claim provided for summarizing and presenting of information in such a way as to speed up "a user's navigation through various views and windows."  *Id.* at 1363 (relying on the patent specification's assertions about the benefits of the invention and concluding that the "language clearly indicates that the claims are directed to an improvement in the functioning of computers").  So too, the 937 and 023 patents allege that the

---

[7] For example, in *Core Wireless*, the Federal Circuit favorably contrasted the claimed "specific manner of displaying a limited set of information to the user" with "conventional user interface methods to display a generic index on a computer."  880 F.3d at 1363.

claimed invention yields improvements in speed, organization, and control of the flow of data. 023 patent at 6:17-21, 7:51-55.

Nor was Aktana's cited authority particularly helpful.  Rather than present in detail a closely analogous Federal Circuit decision (as Veeva did), Aktana cited cases for general principles and occasionally threw in a parenthetical.  In its reply brief, Aktana complained that "Veeva fails to address the cases discussed in Aktana's opening brief, including the *Validity*, *Datavant*, *Epic IP*, *Weisner*, *Realtime Data*, *GeoComply*, *People.ai*, *BSG Tech*, *WhitServe*, *Two-Way Media*, *Cleveland Clinic*, *Content Square*, *Brit. Telecommunications*, *Aftechmobile*, *Fast 101*, and *Electric Power* cases."  DI 34 at 3.  But that's just not how effective advocacy works.[8] Veeva had no obligation to address every casual citation in Aktana's brief, and neither do we. We think Aktana wants us to focus on *Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed Cir. 2016), because Aktana cited it several times and relied upon in oral argument.

In *Electric Power*, the Federal Circuit held claims ineligible that "clearly focused on the combination" of abstract processes, namely, "gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions."  *Id.* at 1354.  The Federal Circuit viewed the claims as merely implementing an abstract idea on a computer, unlike cases where the claims offered "computer-functionality improvements."  *Id.*  As Aktana points out, the claims in *Electric Power* were also fairly wordy, and that did not make them patent eligible.  But Aktana is missing a major

---

[8] As another example, the first paragraph of Aktana's argument section states the conclusion followed by a district court decision that is repeatedly cited but never explained in the brief: "The claims of the '023 and '937 patents are directed to the abstract idea of preparing approved messages and fail to recite any inventive concept. *Validity, Inc. v. Project Bordeaux, Inc.*, No. 23-365-SRF, 2023 WL 6200287, at *3 (D. Del. Sept. 22, 2023)."  DI 21 at 7.

distinction — in *Electric Power*, the extra verbiage in the claim merely "enumerate[ed] types of information and information sources available within the power-grid environment," which makes no difference for the *Alice* analysis.  830 F.3d at 1355.  So *Electric Power* would be compelling authority if the 937 and 023 patent claims padded an abstract idea with examples of types of messages, types of authorization rules, and the like.  But that is not so.  Rather, Aktana has not shown (and it appears unlikely at this stage) that language of the 937 and 023 patent claims is mere filler.

Summing up, Aktana failed to show that the claims of the 937 and 023 patents were directed to the abstract idea of "preparing approved messages," and for that reason we deny the motion to dismiss for lack of patent eligibility with respect to those two patents.

**The 313 patent.**  Turning to the 313 patent, we see the same flaws in Aktana's arguments and reach the same result.  Thus, we can move a little more quickly through the discussion.  This time, Aktana proposes "the abstract idea of generating, displaying, and updating data in a report."  DI 21 at 13.  The proposed idea seems like a fair categorization of the claims, but once again the focus is whether the claims are *directed* to that abstract idea.  Again, it helps to study

17

Aktana's *CLS Bank*-like chart with the proposed abstract idea in mind:

| Representative claim 1 of the '313 Patent | Example of human-practiced activity |
| --- | --- |
| 1. A computer-implemented method for displaying data from a data storage system, the method comprising: | A method for displaying data from a file cabinet, the method comprising: |
| enabling generation of a data visualization interface for rendering a first custom report according to previously received user configuration, wherein the user configuration comprises a first type of data to be displayed at a first location on the first custom report and a second type of data to be displayed at a second location on the first custom report; | providing specifications for rendering a first custom report according to previously received customer directions, wherein the customer directions specify a first type of data to be displayed at a first location on the first custom report and a second type of data to be displayed at a second location on the first custom report; |
| wherein the first type of data and the second type of data are obtained from the data storage system; | wherein the first type of data and the second type of data are obtained from the file cabinet; |
| wherein the data visualization interface comprises instructions in a markup language for specifying the first type of data, the first location, the second type of data, and the second location, and instructions in a second programing language for obtaining the first type of data and the second type of data from the data storage system, and wherein the data visualization interface does not display the first type of data, or the second type of data; | wherein the specifications include instructions in one language for specifying the first type of data, the first location, the second type of data, and the second location, and instructions in a second language for where to obtain the first type of data and the second type of data from the file cabinet, and wherein the specifications do not display the first type of data, or the second type of data; |
| receiving the instructions in the second programing language from the data visualization interface at an application programming interface ("API"); | receiving the instructions in the second language from the specifications at a first inbox tray; |
| sending an API call to the data storage system to obtain the first type of data and the second type of data; | placing instructions in an outbox tray for where to look in the file cabinet to obtain the first type of data and the second type of data; |

| | |
|---|---|
| receiving the first type of data and the second type of data at the data visualization interface; | receiving the first type of data and the second type of data as part of the specifications; |
| rendering the first custom report, wherein the first custom report is based on the first type of data, the first location, the second type of data and the second location in the user configuration; | rendering the first custom report, wherein the first custom report is based on the first type of data, the first location, the second type of data and the second location in the user configuration; |
| displaying the first custom report on a user interface separate from the data visualization interface; | displaying the first custom report on a piece of paper that is not included in the specifications; |
| receiving new data and storing the new data in a memory device; | receiving new data and storing the new data in a box; |
| updating the first customer report rendered by the data visualization interface with the new data from the memory device; | updating the first customer report rendered by the specifications with the new data from the box; |
| receiving an input for accepting the new data to the data storage system; and | retrieving the new data from a second inbox tray for accepting the new data to the file cabinet; and |
| saving the new data to the data storage system in response to the input. | placing the new data in the file cabinet in response to seeing it in the second inbox tray. |

Aktana's chart analysis for the 313 patent suffers from the same flaws as with the 937 and 023 patents: (i) there is plainly much more (of apparent substance) going on in the claim than can be matched up with the proposed abstract idea, and Aktana does nothing to explain those differences; and (ii) characterizing what's going on in the right-hand column as any kind of familiar "human-practiced activity" is facially absurd. Aktana again gives us no firm basis to rule on *Alice* step one.[9]

    As with the 937 and 023 patents, we will also consider "whether the [313 patent] claims are directed to an improvement to computer functionality versus being directed to an abstract idea." *Enfish*, 822 F.3d at 1335. Veeva contends that rather than focus on an abstract idea, the 313 patent claims "improve the display of CRM data, so that users can configure what to display on a custom report and how to arrange and display the content." DI 33 at 8 (relying on *Enfish*).

---

[9] Protracted questioning at oral argument yielded no additional information of use. *See* DI 49 at 46-56.

Again, Veeva has the better of this argument.

First, the claims are aimed at solving a problem caused by computerizing customer relationship management information, because the user interfaces for those systems have many fields "convenient for data entry, but not convenient for users to understand and use the data." 313 patent at 1:14-16.  Second, the patent claims do considerably more than say "generating, displaying, and updating data in a report."  There may be several ways to illustrate the technological approach claimed here, but the Patent Trial and Appeal Board highlighted one for us when it specifically relied on the requirement for a data visualization interface that is separate and distinct from the application programing interface.  DI 33-1 at 19-20 (ECF); *see also Enfish*, 822 F.3d at 1337-39 (explaining how a particular, apparently unconventional, claimed software structure conferred patent eligibility).  As explained in *Core Wireless*, the "generic idea of summarizing information" on a user interface is not patent eligible, but, as here, "a particular manner of summarizing and presenting information in electronic devices" may be.  880 F.3d at 1362.  And third, the context of a user interface, improved "efficiency of using the electronic device" is an adequate technological improvement when the claims are directed to a specific improvement to user interface technology.[10]  *Id.* at 1363.

Aktana again relies primarily on *Electric Power*, but the 313 patent claims do not fall

---

[10] Aside from the obvious understanding that the whole point of improving a user interface is to make using the computer more efficient, the 313 patent does not much discuss the specific benefits of its claimed inventions.  Veeva's counsel argued that, similar to *Enfish* or *Core Wireless*, the claims offer improvements in utilization of computer resources beyond what would arise simply from implementing Aktana's proposed abstract idea on a computer.  DI 49 at 65-66.  Aktana, as movant, did not give us any basis to disbelieve Veeva's position, which is at least consistent with common sense understanding of user interfaces.

within the reasoning of that case any more than did the 937 and 023 patent claims.  Here too,

Aktana failed to show that the claims of the 313 patent were directed to the abstract idea of

"generating, displaying, and updating data in a report," and for that reason we deny the motion to

dismiss for lack of patent eligibility with respect to the 313 patent.

### B.  The infringement allegations are sufficiently pled

Aktana asks us to dismiss the complaint for failing to adequately plead direct

infringement, indirect infringement, and willfulness.  To survive a motion to dismiss, a

complaint must plead "enough factual matter" to "state a claim to relief that is plausible on its

face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007).  In other words, a plaintiff

must plead "factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

do[.]"  *Twombly*, 550 U.S. at 555 (quotation omitted).

**Direct infringement.**  Aktana argues that the first amended complaint's allegations of

infringement against Aktana (meaning Aktana specifically, not Tact.ai) are too vague because

they identify no "Aktana product" and lack the "required element-by-element comparison of at

least one claim to at least one Aktana product."  DI 21 at 19.  The first amended complaint

provides an apparently unobjectionable recitation of how Tact.ai allegedly infringes all three

patents with respect to its products.  DI 14 ¶¶ 16-49.  Then the first amended complaint

implicates Aktana as follows: "Upon information and belief, Aktana has integrated into its

products, offers for sale, sales, and services various aspects of Tact.ai's products and services.

21

Aktana's integration also includes the patent-infringing aspects of Tact.ai's products and services, such as those identified in paragraphs 19-26, 33-40, and 47-49 of this Amended Complaint." *Id.* ¶ 14; *see also* ¶¶ 17, 31, 45 (accusing Aktana of infringement of each of the three patents by "among other things, acquiring Tact.ai's technology, marketing its technology, and providing and integrating the Tact Customer Engagement Platform or its features, including the Tact Field Email product, to customers"). That is sufficient. Counsel for Aktana effectively conceded this at oral argument, and seemed more concerned with conveying his skepticism on the merits of the allegation — but that is for another day. *See* DI 49 at 71-75.

**Indirect infringement and willfulness.** Induced infringement, contributory infringement, and willfulness all require knowledge of the asserted patents. *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1333 (Fed. Cir. 2012) (inducement); *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015) (contributory infringement); *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016) (willfulness). Aktana argues that knowledge (Aktana's — not Tact.ai's) was insufficiently alleged. DI 21 at 20. Considering that Veeva sued Tact.ai in the original complaint and then added Aktana as a party in this case after Aktana acquired Tact.ai's relevant technology, Aktana's argument that it did not know about the patents (or this litigation, we are to believe) when it was added as a party is a non-starter. *See* DI 14 ¶¶ 19-22, 33-39, 47-49.

## IV.   Conclusion

We deny Aktana's motion to dismiss in its entirety. Aktana failed to show that Veeva's patent claims were ineligible under step one of *Alice*. For that reason, we will not proceed to

step two of *Alice*.  *See Core Wireless*, 880 F.3d at 1361 ("If the claims are directed to a patent-eligible concept, the claims satisfy § 101 and we need not proceed to the second step.").  Further, we hold that Veeva adequately pled direct, induced, and willful infringement.