**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| VEEVA SYSTEMS INC. | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | NO.  23-1032 |
| | : | |
| TACT.AI TECHNOLOGIES, INC., | : | |
| AKTANA, INC. | : | |

## <u>MEMORANDUM</u>

**MURPHY, J.[1]**                                                                          **July 3, 2024**


      Fairly universal principles of legal ethics tell us that a lawyer cannot defend her client in a lawsuit and then turn against that client in the same or a substantially related matter.  But this rule is not a black hole inhaling anyone nearing the event horizon.  A new client's choice of counsel is entitled to respect.  Former clients may give informed consent.  And there's nothing strange about lawyers working on many matters of a similar kind — that is the nature of specialization, which is a boon for clients.  Many matters that seem somewhat similar do not really have the kind of relations that run counter to the recognized purposes of the ethical rules.  Nor are the ethical rules weapons for deployment at a whim.

      Here, lead counsel for the defendants, Ms. Christa M. Anderson, Esq., used to represent Veeva at her old firm.  Veeva — the former client — objects and moves to disqualify Ms. Anderson and her new firm.  The focus is on a patent and trade secret case from about ten years ago where Ms. Anderson represented Veeva.  Defendants argue that plaintiff failed to show the two matters are substantially related, and that plaintiff waived its objection.  For the reasons set

---

[1] Judge John Frank Murphy, of the United States District Court for the Eastern District of Pennsylvania.

out below, we agree with Veeva and grant the motion.  Ms. Anderson and her firm, Cooley LLP, are disqualified from their representation of defendants in this case.[2]

I.   **Background**

Aktana[3] is represented in this matter by Ms. Anderson of Cooley LLP.  But Ms. Anderson used to represent Veeva at her old firm, Keker, Van Nest & Peters LLP.  So we start with the facts illuminating similarities between Ms. Anderson's earlier matter representing Veeva and this case.  Then we will discuss more recent facts relevant to Aktana's argument that Veeva waited too long to bring its motion to disqualify.

**Background relevant to substantial similarity.**  The parties in this case sell various software products and services designed to facilitate and enhance sales and marketing communications, especially in highly regulated fields.  *See* DI 14 ¶¶ 9-12.  Veeva accuses Aktana of infringing three patents, two of which are important here: 9,391,937 (the 937 patent) and 9,055,023 (the 023 patent).  *Id.* ¶¶ 16, 30.  Those patents are entitled "System and Method for Controlling Electronic Communications," and as discussed in our recent § 101 decision, the patents generally relate to systems and method for generating approved e-mail messages.  *See*

---

[2] Twelve days after oral argument, defense counsel filed a letter stating that "for reasons unrelated to the pending motion, Aktana has decided to substitute counsel for Cooley.  Aktana will submit the requisite filing to accomplish the substitution, but wished to advise the Court promptly as it renders the pending motion moot."  DI 82.  We disagree.  Cooley has not yet withdrawn; there is no indication that Ms. Anderson or Cooley will not be assisting Aktana in this dispute more generally; and there is no indication of Veeva's position in this withdrawal.  Furthermore, while we unhesitatingly accept counsel's representation that the reasons are "unrelated to the pending motion," here the countervailing interests of the ethical rules — which serve all lawyers, clients, and the public, not just the parties in this case — counsel against simply forgetting this ever happened.

[3] We will refer to the defendants collectively as Aktana unless the difference is important.

*Veeva Sys. Inc. v. Tact.ai Techs.*, 2024 WL 2848335 (D. Del. June 5, 2024).  The inventors on the two Veeva patents are Timothy Murphy, Brian Longo, and Ling Lam.

Ms. Anderson practiced at Keker from 1996 to 2022 and moved to Cooley in 2022.  DI 66 ¶ 2 (declaration of Ms. Anderson).  In 2013, she was lead counsel for Veeva in a patent infringement and trade secret misappropriation case brought by Prolifiq Software, Inc. against Veeva.  *Id.* at ¶ 3; *Prolifiq Software, Inc. v. Veeva Sys. Inc.*, No. 13-cv-3644 (N.D. Cal.).  That case went on for about 15 months.  It settled after the claim construction order — during expert discovery.  Ms. Anderson's own characterization of *Prolifiq* (the fourth entry on her Cooley website biography) is:

> Defended a leading cloud-computing company [Veeva] against patent infringement allegations brought by a competitor [Prolifiq] in the Northern District of California. Successfully narrowed the scope of the case from five patents to two and secured a settlement that was a fraction of the original demand.

DI 57-1 at 6 (ECF).

According to the complaint in *Prolifiq*, back in 2011 Prolifiq sold software designed to "facilitate communication of information in controlled environments, such as those that heavily regulated" — much like Veeva does now.  *Prolifiq*, DI 48 ¶ 12.  Veeva sold a customer relationship management system.  *Id.* at ¶ 23.  At the behest of a mutual client, Prolifiq and Veeva worked together under a confidentiality agreement in 2011 and 2012 to integrate Prolifiq's software with Veeva's.  *Id.* at ¶¶ 23-33.  But according to Prolifiq, Veeva used the opportunity to misappropriate Prolifiq's technology and incorporate it into Veeva's new product, called Approved Email.  *Id.* at ¶¶ 34-41; DI 57-1[4] at 144-45 (ECF) (Veeva's 2013 press release for Approved Mail).  So Ms. Anderson's job in *Prolifiq* was to defend against Prolifiq's

---

[4] Citations to docket items refer to this case unless otherwise noted.

accusations that Veeva's Approved Email software incorporated misappropriated technology and infringed Prolifiq's patents.

The record offers a few details on Ms. Anderson's role in *Prolifiq*.  In support of its motion, Veeva filed several insightful documents as well as some partially unredacted billing records.  *See* DI 57-1; DI 73-1.  In response — rather than seek an order compelling production of the complete records or otherwise digging in — Ms. Anderson filed a declaration averring that she possesses no relevant records and does not remember anything of substance about *Prolifiq*. DI 66.  During the *Prolifiq* litigation, she reported to a Veeva in-house lawyer named Josh Faddis, who is still at Veeva and handling this case as well.  *Id.* at ¶¶ 5, 11.

Ms. Anderson's billing entries — and entries of others on the team referring to Ms. Anderson — reflect her supervision of the Keker litigation team.  DI 57-1 at 52-55, 114-19 (ECF) ("case planning," "case strategy," with attendant meetings and correspondence with Veeva); DI 73-1 at 9-10 (ECF).  Right from the start of the case, Keker lawyers were studying Veeva's Approved Email software.  DI 57-1 at 52, 114; DI 73-1 at 20.   Ms. Anderson was also involved with prior art searching and analysis, as well as inter partes review strategy.  DI 57-1 at 52-55, 66.  The Keker team booked time to preparing for the depositions of Messrs. Murphy, Longo, and Lam (recall: they are the three inventors on the 937 and 023 patents asserted in this case).  *Id.* at 69-71; DI 73-1 at 33.  They also met with Messrs. Murphy and Longo regarding "non-infringement positions" and "potential design arounds."  DI 73-1 at 4, 19.  And the litigation team provided prior art to Veeva's prosecution counsel and IPR counsel and

communicated with prosecution counsel in writing and by phone.  DI 73-1 at 35-42.[5]

Prolifiq and Veeva mediated the case in October, 2014 and then negotiated a settlement the next month.  In that November, Ms. Anderson billed 12.5 hours to settlement tasks, including at least 8.5 hours to drafting and revision of the settlement agreement.  DI 73-1 at 44-49 (ECF).  The settlement agreement is significant because it includes, among other consideration, a cross-license of certain Veeva intellectual property.  DI 57-1 at 36.  Prolifiq received a license to all patents maturing out of several Veeva patent applications (including all continuations and the like), one of which was non-provisional application no. 14/271,134, entitled System and Method for Controlling Electronic Communication (the 134 application).  The 134 application had been filed earlier that year, during the pendency of the *Prolifiq* litigation; it claimed priority to two provisional applications filed in May, 2013.  The 023 patent (in this case) issued from the 134 application, and the 937 patent (also in this case) issued from a continuation of the 134 application.  As one would expect, setting aside the claims, the substantive contents of the 023 and 937 patents are the same as the 134 application.  And Prolifiq's patents from the *Prolifiq* litigation are listed among the references cited in the 023 and 937 patents.

Several years after *Prolifiq*, Ms. Anderson again defended Veeva in a trade secret misappropriation case that apparently has no relationship to this case.  DI 66 ¶ 8 (referring to *Medidata Solutions Inc. v. Veeva Sys. Inc.*, 11-17-cv-589 (S.D.N.Y.)).  Ms. Anderson last performed work for Veeva on that case in 2020.  *Id.*

---

[5] No one has raised any question about Ms. Anderson's team's compliance with the *Prolifiq* protective order, which barred Keker lawyers who received highly confidential information from Prolifiq from participating in patent prosecution (but not IPRs).  *Prolifiq*, DI 41 ¶ 8.  But the information of greater interest is **Veeva's**, which of course was irrelevant to Ms. Anderson's compliance with the prosecution bar.

**Background relevant to waiver.**  The story picks up again in 2023 — after Ms. Anderson moved to Cooley — when she became lead counsel for Aktana in this dispute with Veeva.  This case was filed in September, 2023, initially against only Tact.ai.  DI 1.  On November 1, 2023, Aktana announced that it had acquired the relevant Tact.ai technology.  DI 14 ¶ 14.  That is when Ms. Anderson got involved.  DI 66 ¶ 11.

Ms. Anderson's representation of Aktana was well known to Veeva.  Between November 2, 2023 through the end of January 2024, she communicated more than 50 times with Veeva representatives including Mr. Faddis (recall: he was her point of contact when she represented Veeva).  DI 66 ¶ 11.  Although the parties were understandably guarded about the nature of these communications, it was made sufficiently clear during oral argument that they were exploring the possibility of settlement.  For those first three months, Veeva never complained about Ms. Anderson's involvement, and Ms. Anderson never sought Veeva's informed consent to represent Aktana against it.  Veeva's reason is that Mr. Faddis did not remember what *Prolifiq* was about and their team did not investigate until Aktana moved to dismiss in mid-January 2024; Aktana's reason is that it was not Ms. Anderson's responsibility to say something.  To be clear — those are representations of counsel unsupported by declarations.

On November 7, 2023, Veeva filed an amended complaint naming Aktana.  DI 14.  And Ms. Anderson moved to appear *pro hac vice* on November 22.  DI 18.  Aktana sought and received an extension of time to respond to the amended complaint, which led to Aktana's January 16, 2024, motion to dismiss for lack of patentable subject matter.  DI 21.  That is when Veeva raised its hand about Ms. Anderson.  It then took a little over two months until Veeva filed the motion to disqualify.  DI 56.

6

On January 31, 2024, Veeva's counsel wrote a 3-page letter to Cooley identifying Ms. Anderson's work on the *Prolifiq* litigation when she was at Keker and explaining the connection with Veeva's Approved Email software.  DI 57-1 at 2-4 (ECF).  Veeva told Cooley that if Ms. Anderson did not withdraw from the case, Veeva would move to disqualify Cooley.  *Id.* at 4. Veeva also requested that Ms. Anderson cease work on the case and requested an immediate meet-and-confer.  *Id.*

Two weeks later, after the meet-and-confer, Cooley responded briefly and characterized Veeva's assertions of conflict as overbroad.  *Id.* at 78 (ECF).  Cooley asked Veeva to "identify specific confidential information that allegedly creates a conflict" and offered to agree that it would not waive privilege to do so.  *Id.*  Cooley's letter indicated that the parties discussed the timeliness of Veeva's objection, and that "Veeva ha[d] been aware of this issue and acknowledged that Veeva did not have any objection to Ms. Anderson's participation until after substantive briefing on Aktana's motion to dismiss."  *Id.*

Two weeks after that — taking us to the end of February — Veeva's counsel responded with a densely cited 6-page letter with attachments such as the cross-license and certain billing records.  *Id.* at 80-154 (ECF).  The letter argued the issues — substantial similarity and waiver — at a level of detail roughly similar to Veeva's eventual motion.  The letter alleged that Cooley would be bound by Ms. Anderson's conflict, but offered to walk away if Ms. Anderson would withdraw.  *Id.* at 84-85.  If she would not, "by 5:00 p.m. ET on Friday, March 1, 2024," then Veeva would raise the issue with the court.  *Id.* at 85.

But there was a slight problem.  Earlier in February, Veeva's counsel had asked if Cooley would agree to keep some of the attachments confidential, and apparently Cooley never

responded.  *Id.* at 160-61 (ECF).  Veeva sent its letter and attachments anyway on February 28,

2024, citing its proposed terms and Delaware Local Rule 26.2 (which effectively affords

automatic attorney's-eyes-only protection in advance of a stipulated confidentiality agreement).

*Id.* at 160.  Two hours before Veeva's 5:00 p.m. deadline on March 1, Cooley responded by e-

mail that its team had deleted Veeva's letter because they had not agreed to confidentiality.  *Id.*

at 159.  Cooley invited Veeva to resend the materials under modified terms.  *Id.*  Veeva's counsel

did so later that evening.  *Id.* at 158.  The upshot of all this is that after March 1, Veeva was

again waiting for Cooley to respond.

On March 7, 2024, we held a combined hearing on Aktana's motion to dismiss and Rule

16 conference.  Nobody said a thing.[6]

On March 13, 2024, Veeva sent Cooley a follow-up e-mail asking Cooley to respond to

its last letter by March 20.  DI 73-1 at 51 (ECF).  Cooley replied tersely on March 20, 2024.  DI

57-1 at 156 (ECF).  Cooley's final letter disagreed without much explanation, characterized

Veeva's position as tactical, and observed that Veeva had not gone to court despite several

threats.  *Id.*  The letter concluded that there was no conflict of interest, and neither Ms. Anderson

nor Cooley would withdraw.  *Id.*  Veeva filed its motion to disqualify Cooley on April 10, 2024.

**The motion to disqualify.**  Veeva's motion is simple enough: Ms. Anderson must be

disqualified because she is violating the rule against being adverse to a former client in a

substantially related matter without informed consent.  DI 57 (relying on Model Rule of

Professional Conduct 1.9).  And because Cooley declined to screen Ms. Anderson from this case,

Cooley must also be disqualified.  *Id.* (relying on Model Rule of Professional Conduct 1.10).

---

[6] As old saying begins, sometimes I feel like a mushroom.  You know the rest.

Aktana's opposition sets the battle lines.  DI 65.  There is no dispute that Ms. Anderson used to represent Veeva, and that Aktana's interests here are materially adverse to Veeva's.  Nor has Aktana argued that Ms. Anderson may be screened from the case — Aktana seeks an all or nothing ruling.  Rather, Aktana argues that Veeva failed to meet its burden to demonstrate that this matter is substantially similar to *Prolifiq*, and argues that, in any event, Veeva's delay in filing the motion forecloses any attempt to disqualify Cooley.  We held oral argument, and neither side offered live testimony or asked for the opportunity to cross examine Ms. Anderson or any other witness.

## II.   <u>Analysis</u>

In a Delaware patent case, the federal law of the Third Circuit controls a motion to disqualify counsel.  *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1575-76 (Fed. Cir. 1984) (holding that disqualification is among the "procedural matters, that are not unique to patent issues); *United States v. Miller*, 624 F.2d 1198, 1200 (3d Cir. 1984) ("[S]upervision of the professional conduct of attorneys practicing in a federal court is a matter of federal law.").  A "district court's power to disqualify an attorney derives from its inherent authority to supervise the professional conduct of attorneys appearing before it" and "is committed to the sound discretion of the district court."  *Miller*, 624 F.2d at 1201.  In the District of Delaware, attorney conduct is "governed by the Model Rules of Professional Conduct of the American Bar Association."  Dist. Del. Local Rule 83.6(d).

A district court "should disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule."  *Miller*, 624 F.2d at 1202.  "It should consider the ends that the disciplinary

rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions." *Id.* Thus, it is not so much that disqualification is "disfavored" as Aktana urges (and some district courts have said).[7]  Rather, the basis for disqualification — the violation of the ethical rule — must be clear enough to overcome any relevant countervailing policies identified by the Third Circuit.  Further, a district court must be mindful of the concerns recognized by the Supreme Court "about tactical use of disqualification motions to harass opposing counsel." *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 436 (1985) (conferring to the district judge "primary responsibility to police the prejudgment tactics of litigants").  In other words — disqualification must be the necessary consequence of the demonstrable conduct.

### A. Ms. Anderson's representation of Aktana in this case contravenes Model Rule 1.9

Turning to the basis for disqualification here, Model Rule of Professional Conduct 1.9 requires that:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

The Third Circuit explained the benefits of this rule and touched on three principles — protecting against the prospect of disclosure of confidences, maintaining public trust and integrity, and guarding the expectation of loyalty:

> A rule against representation of interests adverse to a former client in the same or substantially related litigation has several purposes.  It is a prophylactic rule to prevent even the potential that a former client's confidences and secrets may be

---

[7] *E.g.*, *Regalo Int'l, LLC v. Munchkin Inc.*, 211 F. Supp. 3d 682, 689 (D. Del. 2016); *Intellectual Ventures I LLC v. Checkpoint Software Techs Ltd.*, 2011 WL 2692968, *4 (D. Del. June 22, 2011); *Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*, 491 F. Supp. 2d 510, 513 (D. Del. 2007).

used against him.  Without such a rule, clients may be reluctant to confide completely in their attorneys.  Second, the rule is important for the maintenance of public confidence in the integrity of the bar.  Finally, and importantly, a client has a right to expect the loyalty of his attorney in the matter for which he is retained.

*In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 161 (3d Cir. 1984).[8]

In that way, the Third Circuit instructs us to focus on the **potential** harms of violating the rule rather than demanding a showing of an actual breach of the duties of confidentiality or loyalty.  *Id.*; *see also W.L. Gore & Assocs., Inc. v. IMPRA*, 745 F.2d 1463, 1466 (Fed. Cir. 1984) (applying Ninth Circuit law and looking for a "reasonable probability" that relevant confidences were disclosed).  Aktana dedicates a section of its brief to arguing that Veeva failed to "establish that Ms. Anderson obtained any privileged and confidential information that could be used to Veeva's detriment."  DI 65 at 15.  Obviously, an actual breach of confidences would be damning.  But the point of the rule is to *avoid* that result or even the appearance.  As with many ethical standards, the focus is on enforcing clear lines to protect the attorney-client relationship and integrity of the bar.  For the same reason, we simply cannot abide by Aktana's argument that Veeva had to show that Ms. Anderson had access to Veeva information in *Prolifiq* that she would not be getting to see anyway during the course of discovery in this litigation.  *Id.* at 12-13 (citing *Tradewinds Airlines, Inc. v. Soros*, 2009 WL 1321695, at *8 (S.D.N.Y. May 12, 2009). That proposal, if adopted, would be a remarkable and unwarranted derogation from Model Rule 1.9.  *Tradewinds* certainly does not endorse such a principle, or even address a motion to

---

[8] The availability of circuit-level precedent for disqualification motions went off a cliff after 1985, when the Supreme Court held that orders disqualifying counsel in civil cases "are not collateral orders subject to appeal as 'final judgments' within the meaning of 28 U.S.C. § 1291." *Richardson-Merrell*, 472 U.S. at 440.

disqualify brought under Model Rule 1.9.  Rather, it deals with whether there had been (or was likely to be) a violation of a protective order.  2009 WL 1321695 at *5.

Turning to the facts, it is undisputed that: Ms. Anderson had an attorney-client relationship with Veeva; Aktana's interests are materially adverse to the interests of Veeva; and Veeva has not consented to Ms. Anderson's representation of Aktana.  Aktana challenges only one part of Veeva's assertion that Ms. Anderson's representation in this matter violates Model Rule 1.9: whether or not *Prolifiq* is substantially related to this case.  We find that it is.

Many situations like this will not get crosswise with Model Rule 1.9 because — as Aktana repeatedly points out — in both *Prolifiq* and here, Ms. Anderson represented the defendant.  Thus, in *Prolifiq*, she was focused on Prolifiq's patents and Veeva's accused technology.  Now, she is focused on Veeva's patents and Aktana's accused technology.  That is a good place for Aktana to start, and often that would end the inquiry into substantial similarity in a patent case.  But Veeva bridges this gap with two compelling connections: the similarities between Veeva's accused technology in *Prolifiq* and Veeva's patents in this case; and the *Prolifiq* settlement cross-license, which conveyed to Prolifiq rights to Veeva's patents in this case.

First, we find that Veeva demonstrated that there is a specific technological overlap between *Prolifiq* and this case.  Aktana does not deny that *Prolifiq* and this case both generally involve software for sending approved electronic messages.  And technological similarity is an important ingredient for substantial relationship in technology-driven cases, because key client confidences and concerns — as well as advocated positions — flow from the technology involved.  *E.g.*, *W.L. Gore*, 745 at 1467 (affirming disqualification where "[t]he technical subject

matter of each suit is the same").  But we agree with Aktana that Veeva cannot carry its burden with "general, categorical allegations of similarity."  DI 65 at 8; *see, e.g.*, *Volterra Semiconductor LLC v. Monolithic Power Sys.*, No. 19-2240, 2020 WL 8340048, at *4 (D. Del. Aug. 26, 2020) (finding that "DC-to-DC converter technology" was too broad a subject area to establish a substantial relationship between two representations because the technology is employed in "various electronic equipment and systems").  Here, however, we find that the technological similarity is specific to Veeva's Approved Email software.

As discussed above, in the *Prolifiq* litigation, Ms. Anderson led a team of lawyers defending against allegations that Veeva's Approved Email software infringed Prolifiq's patents and incorporated Prolifiq's technology.  Doing that job all the way through expert discovery required collecting and analyzing information from Veeva about how Approved Email works.  That is not speculation, as Aktana suggests — it is a requirement of that sort of representation.  Although not essential to make the point, the billing records verify that Ms. Anderson's team undertook this basic task.  *E.g.*, DI 57-1 at 52, 114; DI 73-1 at 20.

We also find that Veeva established a sufficiently clear connection between the Approved Email software at issue in *Prolifiq* and the 023 and 937 patents it is asserting in this case.  We can start with several quotes from Ms. Anderson's own argument a few months that the claims of the 023 and 937 patents are not patent eligible:

- "this claim is claiming a method to generate approved messages," DI 49 at 7:20-21;
- "[h]ere, you have method for generating approved messages," *id.* at 12:10-11;
- "this patent purports to be directed at generating these approved messages to folks who are in the field working in a particular area of pharmaceutical," *id.* at 18:24-19:2;
- "[i]t is not more than generating an approved message," *id.* at 23:13-14;
- "[t]his is an approved message patent," *id.* at 45:21-22.

13

Indeed, that is just how Veeva described Approved Email at its 2013 launch: "Veeva Systems' new Approved Email solution is set to radically increase the productivity of life sciences sales teams by enabling users to email approved content to customers."  DI 57-1 at 144 (ECF). Furthermore, the inventors on the 023 and 937 patents — Messrs. Murphy, Longo, and Lam — appear many times in Veeva's *Prolifiq* billing records.  Ms. Anderson's team was communicating with them, meeting with them, preparing them for depositions, and even strategizing with them regarding "non-infringement positions" and "potential design arounds," which are high-level tasks requiring a combination of factual information about Approved Email and legal analysis.  DI 57-1 at 69-71 (ECF); DI 73-1 4, 19, 33 (ECF).  The simplest explanation for all this jumps off the page: the 023 and 937 patents describe the same technology as one might find in Approved Email.[9]

Aktana does not try to refute that Veeva's Approved Email was at the heart of *Prolifiq*. Instead, Aktana tries to dilute the relevance of Approved Email to this case in several ways. First, Aktana argues that there is no evidence that Ms. Anderson's Keker team in *Prolifiq* got involved with the preparation or prosecution of the patent applications that led to the 023 and 937 patents.  The billing records certainly raise a question about this, but Aktana is correct that the records do not discuss specific patent applications.  Regardless, that does not change our conclusion that Ms. Anderson's team was drawing from the very same pool of technical information as the drafters of the patent applications.

---

[9] The second reason we conclude that *Profliq* is substantially related to this case — the cross-license discussed below — also endorses this conclusion.  While it is possible Veeva might have cross-licensed irrelevant technology as part of the settlement, it is considerably more likely that the technology was something Prolifiq wanted access to for good reason (or even felt entitled to — remember it was a trade secret case as well).

Second, Aktana argues that there have been many versions of Approved Email over the years, so whatever versions of Approved Email may be relevant in this case came ten years after the versions at issue in *Prolifiq*.  Again, that is probably true, but the relevant connection is between the versions of Approved Email available during *Prolifiq* and the applications for the 023 and 937 patents — and those were contemporaneous.  To be sure, the earliest potential priority date stated on the face of the 023 and 937 patents is several months after Veeva's Approved Email launch press release.  But that is more than close enough to establish the troubling technical overlap.

Third, Aktana argues that not only has Veeva not shown that Approved Email is covered by the claims of the 023 and 937 patents, Veeva has thus far pointedly avoided taking that position in discovery.[10]  But this argument misses the mark too, because exactly what the claims do or not cover is not the point — the question is the technical similarities, which are evidenced more by the patents in their totality than the claims.  It is neither surprising nor particularly germane that the scope of the claims (and the precise details of Approved Email, as Aktana itself argued) changed since the time of *Prolifiq*.

Aktana's criticisms do not significantly detract from the clear evidence that Ms. Anderson's representations in *Prolifiq* and this case involve the same Veeva technology.

Setting aside Approved Email, the *Prolifiq* cross-license reveals an entirely independent reason why *Prolifiq* and this case are substantially related.  As discussed, *Prolifiq* ended in a cross-license.  Both Veeva and Prolifiq put something of value on the table, and Veeva's side

---

[10] Veeva argues that Approved Email is marked with the 023 and 937 patents, but the website Veeva points to lists quite a few patents and software products — we give it little weight in this context.  DI 57-1 at 139-42 (ECF).

included a license to all patents maturing out of its 134 application.  Within a few years, the 134 application yielded the 023 and 937 patents.  This is more than a glancing blow to the question of whether *Prolifiq* is substantially related to this matter.

First, the *Prolifiq* cross-license is at least relevant, if not critically important, to the damages side of this case.  "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a ***reasonable royalty*** for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  35 U.S.C. § 284 (emphasis added).  A lot goes into determining a reasonable royalty, but it almost always involves trying to figure out "the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).  Past licenses of the patents at issue in the case are an important category of evidence bearing on the determination of a reasonable royalty.  *Id.* at 1325-26.  The analysis is nuanced — it requires a careful understanding of the technical and economic differences between the license and the context of the hypothetical negotiation.  *Id.* at 1325-32.  The point is that the *Prolifiq* cross-license is destined to be studied under a microscope in this case, and the parties are certain to differ on how that cross-license informs the basic question of: "what is it worth to infringe the 023 and 937 patents?"

Second, consider Ms. Anderson's job in *Prolifiq*.  She was lead counsel, drafted and revised the cross-license for at least 8.5 hours, and communicated with her client, Veeva, and with Prolifiq during the negotiation.  At some point, it was requested, suggested, or decided to put the 134 application on the table.  Ms. Anderson's duty was at least to be informed about by

16

her client — if not participate in the analysis of — what that offer was worth to Veeva (and Prolifiq).  That sort of thinking was necessary not only to provide good counsel to her client, but also to intelligently conduct the negotiation with Prolifiq.  In other words, Ms. Anderson's representation of Veeva in *Prolifiq* required her to form a view (or at least be informed of Veeva's view) on what a license to the 023 and 937 patents (or anything else that might flow out of the 134 application) would be worth to Veeva and Prolifiq.  And it is only logical that her position back then was that the license was valuable.

The cross-license forms a troubling connection between *Prolifiq* and this case.  In this case, the most likely position Ms. Anderson would take is either that the *Prolifiq* cross-license tends to show that the 023 and 937 patents lack value or that it is irrelevant for all manner of reasons.[11]  Probably both.  But Ms. Anderson ***negotiated that cross-license***.  So whether she is arguing that the circumstances in *Prolifiq* were different, or that the patents just lack value, the reversal of roles from then to now is stark.  Her presence at the negotiation table in *Prolifiq* and her access to Veeva's strategy in that negotiation makes her representation of Veeva in this case untenable.[12]

Summing up, for either of the independent reasons outlined above — and certainly when combined — we find that Ms. Anderson's representation of Veeva in *Prolifiq* was substantially

---

[11] Just a few confounding factors that commonly arise in the caselaw: the cross-license included a variety of other considerations going both ways; it involved technology other than Approved Email; it was part of a litigation settlement and not a free-standing license negotiation; and the parties were in different economic negotiating positions than Veeva and Aktana.

[12] At oral argument, Aktana was open to the idea that Ms. Anderson could be exposed to discovery and even testify at trial about the *Prolifiq* cross-license.  No need to explore that unappetizing possibility.  If an exploration of whether two cases are substantially related leads to that conclusion, it is a pretty good sign that disqualification is appropriate.

related to her representation of Aktana against Veeva in this case.  Aktana's argument that Ms. Anderson retained no files and remembers nothing of use is beside the point.  The rule is "prophylactic" and serves as a bulwark of client confidence in attorney loyalty and "public confidence in the integrity of the bar." *Corn Derivatives*, 748 F.2d at 161.

### B. Veeva did not waive by delaying its motion to disqualify.

As described at length above, it was five months from when Veeva found out that Ms. Anderson was representing Aktana to when Veeva filed a motion to disqualify.  Waiver has no numerical presumptions,[13] but let us acknowledge it — that is a fairly long time.  It is a red flag telling us look for signs that Veeva's motion was tactical and factor that into our analysis. *Richardson-Merrell*, 472 U.S. at 436.  But a careful consideration of the activities over those five months reveals that the delay does not amount to waiver.

Consistent with the Supreme Court's concerns about tactical misuse of disqualification motions, waiver is a recognized and often applied basis for deny a motion to disqualify.  *See Conley v. Chaffinch*, 431 F. Supp. 2d 494, 498-99 (D. Del. 2006).  Waiver is a fact-specific inquiry, and when applied to motions to disqualify, courts typically consider the amount of delay, the reasons for it, any signs of harassing behavior, and the potential for unfair prejudice. *E.g.*, *id.* 498-500; *Commonwealth Ins. Co. v. Graphix Hot Line, Inc.*, 808 F. Supp. 1200, 1208 (E.D. Pa. 1992).

Here, there are two periods of delay with two different justifications: the first delay of about three months from when Veeva learned of Ms. Anderson's representation of Aktana to

---

[13] In spite of both sides' unhelpful reliance on cases with wildly different fact patterns to suggest nothing more than that "3 months is enough" or "12 months isn't too much" and the like.

when Veeva first objected, and the second delay of about two months from Veeva's first objection to the filing of this motion.  The latter is easier to address.  At the end of January, 2024, Veeva began a letter-writing campaign, asking Aktana repeatedly to screen Ms. Anderson off the case and explaining the basis for doing so in increasing detail.  The exchange was not exactly a flurry back-and-forth, but it was legitimate and fast enough.  Parties facing a dispute over a potential conflict ***should*** communicate with each other — in great detail — and try to avoid motion practice.  Often, there must be time for a diligent investigation and exploring a negotiated settlement of the dispute.  Unless it is clear from the timeline and the correspondence that the objecting party is not being sincere or taking the negotiation seriously, this type of delay before filing a motion to disqualify should not be held against the movant.  In most situations, a rush to the courthouse would be ***more*** troublesome.  In some ways, it might have been nice to discuss this problem at the Rule 16 conference, which came in the middle of the letter-writing campaign.  But that is in hindsight now knowing that the motion was filed.  Far better to resolve such a sensitive and unpleasant issue between the parties.

The earlier, three-month, delay is more difficult.  We cannot agree with Aktana's suggestion that delay alone is sufficient to trigger waiver.  DI 65 at 18-20.  The reasons for delay matter.  Nor can we agree with Veeva's suggestion that there was no particular need to raise its disqualification objection until after Aktana filed its motion to dismiss.  DI 73 at 8.  That motion doubtless turned up the temperature in the litigation, but it remains important to understand what was going on before.  The parties have been tight-lipped, but there are some clues: Ms. Anderson averred that she was communicating directly with her former client, Veeva and its in-house counsel; the parties indicated that there is a confidentiality agreement in place; there was an

agreed extension to the deadline for Aktana to respond to the amended complaint; and Veeva's counsel at least hinted at oral argument that the parties were exploring settlement.

The prospect of settlement discussions presents a quandary.  On one hand, much like the letter-writing campaign, we are hard-pressed to discourage settling a case.  On the other hand, we again reject Veeva's suggestion that somehow Ms. Anderson's conflict was less problematic during settlement negotiations than it is now, and did not even become ripe until the motion to dismiss.  Just as easily as active litigation, settlement negotiations could allow Ms. Anderson and Aktana to rely on Veeva's failure to object — especially since Ms. Anderson was talking directly to her former client contact.  The record is murky on exactly who remembered about *Prolifiq* and when.  The safest conclusion is consistent with common sense: Ms. Anderson and Veeva obviously remembered each other, but whatever they remembered about *Prolifiq*, they **both** chose to set concerns aside and try to settle the case.  If we knew more, there might be reasons to find that one side or the other tactically bit its tongue.  But we do not.  "[T]he prudent course of action would have been for Ms. [Anderson], upon identifying [Veeva] as a 'potentially adverse party,' to provide notice to [Veeva] of the potential conflict and request a waiver."  *Talecris*, 491 F. Supp. 2d at 515 n.3.  And so the most reasonable inference we can draw from Ms. Anderson's failure to do so is that both sides were content to stay quiet and try to get the case settled.  On this record, we could not find waiver without unduly discouraging otherwise healthy settlement discussions.

As for possible prejudice, there is surely some.  But it is not unfair or unreasonable given what the parties did over the course of those five months and the early stage of the case.  Bear in mind that five months, while long, must be placed into the context of a multi-year patent

litigation.  *See, e.g.*, *EON Corp. IP Holdings LLC v. Flo-TV Inc.*, 2012 WL 4364244, at *5-6 (D. Del. Sept. 24, 2012) (acknowledging that the disqualification motion took a year to file, but finding that "the case is still young").  We are early in fact discovery, well before claim construction or expert discovery.  There is no unfair prejudice weighing in favor of finding waiver here.

### C. The disqualification extends to Cooley.

Model Rule 1.10 imputes a lawyer's Model Rule 1.9 conflict to her law firm absent certain exceptions.  None of those exceptions is relevant here.  Often, in a situation like this, where the conflict "arises out of the disqualified lawyer's association with a prior firm," disqualification could be avoided if:

> (i) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom;

> (ii) written notice is promptly given to any affected former client to enable the former client to ascertain compliance with the provisions of this Rule, which shall include a description of the screening procedures employed; a statement of the firm's and of the screened lawyer's compliance with these Rules; a statement that review may be available before a tribunal; and an agreement by the firm to respond promptly to any written inquiries or objections by the former client about the screening procedures; and

> (iii) certifications of compliance with these Rules and with the screening procedures are provided to the former client by the screened lawyer and by a partner of the firm, at reasonable intervals upon the former client's written request and upon termination of the screening procedures.

As described earlier, Veeva repeatedly asked Aktana to screen Ms. Anderson from the case.  But Aktana refused, and even in opposition to the motion to disqualify, elected to go all-or-nothing.  Therefore, we have no choice but to extend our conclusion that Ms. Anderson must be disqualified to Cooley.

**III.** <u>**Conclusion**</u>

There is no room for another result here.  Because Ms. Anderson's representation of Aktana against Veeva in this case violates Model Rule 1.9, we must grant the motion to disqualify her.  And because her law firm, Cooley, has not accepted Aktana's request to screen her or argued that screening would be an appropriate resolution, we must disqualify Cooley from representing Aktana in this matter as well.  Veeva's five-month delay in bringing this motion is not a good thing on the whole.  But there was some brinksmanship on both sides here, and the facts do not amount to waiver.  In the end, this ruling is not about who wore the white hat.  It is required by the ethical rules.